## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| **CLAUDIA E. POLANCO,** | |
| **Plaintiff,** | **Case No.: 3:17-cv-00466-GCM** |
| **vs.** | **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| **HSBC BANK USA NATIONAL ASSOCIATION** *et al.*, | |
| **Defendants.** | |

Defendants HSBC Bank USA, N.A. ("HSBC") and PHH Mortgage Corporation ("PHH") (collectively, "Defendants") respectfully submit this Memorandum of Law in support of Defendants' Motion for Partial Summary Judgment as to Plaintiff Claudia E. Polanco's ("Plaintiff") claims seeking damages for emotional distress, as well as her individual claims for fraud, negligent misrepresentation, negligent servicing, negligent infliction of emotional distress, North Carolina Mortgage Debt Collection and Servicing Act, Real Estate Settlement Procedures Act, North Carolina Unfair Trade Practices Act, and North Carolina Debt Collection Act.

### INTRODUCTION

This case arises out of a November 2015 loan modification. In addition to her breach of contract lawsuit, Plaintiff brings extra-contractual claims sounding in tort. Although subsequent investigation has revealed problems with implementation of the terms of the loan modification, it is now apparent that many of Plaintiff's tort-related allegations are simply unfounded. Given that discovery is complete, the case is now ripe for the dismissal of Plaintiff's emotional distress claims as well as her other tort causes of action.

In 2007 Plaintiff's husband, Oscar Polanco, obtained a $214,000.00 loan secured by Plaintiff's real property located in Mecklenburg County, North Carolina. The loan was

subsequently modified in 2010. By 2013, however, the loan was once again in default. Plaintiff's efforts to apply for a second loan modification were initially unsuccessful but, in 2015, PHH sought and obtained an exception for Plaintiff to be given a modification upon completion of several trial payments. Plaintiff completed her trial payments and signed the modification agreement in November 2015. As a benefit to Plaintiff, the modification did not increase Plaintiff's principal balance. The modification did not address $17,709.95 in escrow arrearages, which had accrued as a result of PHH's payments for taxes and insurance while the account was in default.

PHH did not immediately implement the modification and, when it did so, payments were applied to the negative escrow balance rather than as monthly payments. This payment application resulted in the loan being temporarily referred out for foreclosure proceedings, although no foreclosure was carried out on the loan and Plaintiff never lost possession of the home. In an effort to work with Plaintiff, PHH made adjustments to the account in March 2017, including contribution of PHH's own funds to bring the loan current. However, the negative escrow balance for the loan was only partially waived, lending further confusion to servicing of the account.

Plaintiff alleges she experienced depression and anxiety due to the handling of her account. Although Plaintiff would have the Court believe her condition is solely attributable to PHH, her own testimony proves Plaintiff experienced regrettable traumatic or stressful events unrelated to any actions of Defendants, such as her bout with cancer and separation from her husband. Plaintiff disclosed to her mental health provider that her feelings of depression *started* when she was diagnosed with cancer, which is understandable and honest. However, as sympathetic as one can be to her situation, Plaintiff must acknowledge that these statements directly rebut her claim that Defendants caused her alleged emotional injuries.

Because Plaintiff has, by her own admission, attributed her feelings to something other than PHH's handling of the account, Plaintiff cannot now show her emotional distress was caused by the actions of Defendants, meaning such claims are not appropriate for the trier of fact. Furthermore, Defendants are entitled to summary judgment on Plaintiff's individual causes of action for fraud, negligent misrepresentation, negligent servicing, negligent infliction of emotional distress, North Carolina Mortgage Debt Collection and Servicing Act, Real Estate Settlement Procedures Act, North Carolina Unfair Trade Practices Act, and North Carolina Debt Collection Act, because Plaintiff has failed to produce evidence creating a genuine issue of material fact as to one or more elements of her claims.

## STANDARD OF REVIEW

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In considering the motion, the court views all evidence in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 123-24 (4th Cir. 1990). The moving party bears the initial burden of informing the district court of the basis for its motion, and identifying the matters as to which it believes there to be an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The burden on the moving party may be discharged by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the movant has met the initial burden, the non-moving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (*quoting* Fed.R.Civ.P. 56(e)). A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,*

3

477 U.S. 242, 248 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249–50.

**ARGUMENT**

**I.** **There is no evidence Plaintiff's alleged emotional distress was caused by any actions of Defendants**

Plaintiff asserts she is entitled to emotional distress damages on several of her claims. Regardless of the theory of liability, however, there is no evidence from which a jury could reasonably determine that any emotional distress Plaintiff purportedly experienced was proximately caused by Defendants. This is especially true in light of Plaintiff's acknowledgment that she suffered from multiple traumatic or stressful events, including her cancer diagnosis and separation from her husband, as well as Plaintiff's admission that her feelings of depression started when she was diagnosed with cancer. Because Plaintiff has presented no evidence that would enable the jury to do more than speculate as to whether the Defendants' actions were the cause of her alleged injuries, Defendants are entitled to summary judgment as to recovery for emotional injury.

Under North Carolina law, "a plaintiff does not have a remedy for garden variety anxiety or concern, but only for *severe* distress." *Pacheco v. Rogers & Breece, Inc.*, 157 N.C. App. 445, 449, 579 S.E.2d 505, 508 (2003) (emphasis original). "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. . . . It is for the court to determine whether on the evidence severe emotional distress can be found." *Id.* at 449, 579 S.E.2d at 508. "'Severe emotional distress' means any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by

4

professionals trained to do so." *Johnson v. Ruark Obstetrics & Gynecology Assocs.*, P.A., 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990).

The Fourth Circuit has warned that emotional distress claims are "fraught with vagueness and speculation" and are "easily susceptible to fictitious and trivial claims." *Ross v. F.D.I.C.*, 625 F.3d 808, 818 (4th Cir. 2010) (*quoting Price v. City of Charlotte*, 93, F.3d 1241, 1250 (4th Cir. 1996)). Accordingly, "[a]n award of actual damages for emotional distress may not be made on guess and speculation, but must have adequate competent evidence to support it." *Crawford v. Coll. Life Ins. Co. of Am.*, 831 F.2d 1057 (4th Cir. 1987). "[P]roof of causation must be such as to suggest 'probability' rather than mere 'possibility,' precisely to guard against raw speculation by the fact-finder." *Sakaria v. Trans World Airlines,* 8 F.3d 164, 173 (4th Cir. 1993).

Due to the foregoing concerns, courts in the Fourth Circuit have carefully scrutinized emotional distress claims that are based solely on lay testimony, without corroboration from the medical record. Where a plaintiff's own testimony is the sole support for an emotional distress claim, such testimony must "establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated." *Bryant v. Aiken Reg'l Med. Centers, Inc*. 333 F.3d 536, 546-47 (4th Cir. 2003). The plaintiff must also "show a causal connection between the violation and her emotional distress." *Id.* at 547. In *Ross*, the 4th Circuit found that the defendant was entitled to summary judgment where the medical history showed no evidence that the plaintiff mentioned the defendant's actions to her physicians, and her emotional distress claim was supported only by her own "conclusory statements." *Id.*; *see also Primrose v. Castle Branch, Inc.*, No. 7:14-CV-235-D, 2017 WL 57800, at *8 (E.D.N.C. Jan. 3, 2017) (granting summary judgment where Plaintiff failed to provide evidence of specific, demonstrable emotional distress); *Hirapetian v. City of Charlotte*, No. 3:10-CV-00209, 2011 WL 2975673, at *5 (W.D.N.C. July 21,

5

2011) (granting summary judgment on intentional and negligent infliction of emotional distress claims where "Plaintiff has failed to offer medical documentation or any other type of evidence that he has suffered any type of severe emotional distress").

The problems with using uncorroborated lay testimony to prove causation are heightened where there is evidence of multiple alternative causes of the Plaintiff's distress. In *Harrison v. Edison Bros. Apparel Stores*, 814 F. Supp. 457, 466 (M.D.N.C. 1993), the court observed that there were "numerous stressors" suffered by the plaintiff that were distinct from the actions of the defendant, including the plaintiff's marriage and subsequent separation from her husband, as well as two miscarriages. The plaintiff in *Harrison* failed to present expert testimony demonstrating a causal connection between her emotional distress and the actions of the defendant. The District Court found that the defendant was entitled to summary judgment on the issue of causation where other circumstances were more likely to have caused plaintiff's injuries or, "[i]n the least, these other stressors are possible alternative causes of Ms. Harrison's emotional injuries, and there is no evidence presented as to which possible cause is the correct one." *Id.*

In this case, Plaintiff admitted to multiple sources of trauma or stress in her life that are separate from any actions of the Defendants. Plaintiff testified she was diagnosed with throat cancer in October 2016 and that as a result, she "thought [she] was going to die." (Polanco Dep: 48:5-9, 83:13-19).[1] Plaintiff additionally testified that her husband left the home prior to the 2015 modification (Polanco Dep: 16:16-18, 82:10-13), and she admitted to significant alcohol consumption in the amount of seven beers per day. (Polanco Dep. 94:13-25, 95:6-15.).

Plaintiff is expected to testify that in March 2017 she was prescribed medication by her oncologist, David Eagle, M.D., after reporting feelings of depression. There is no evidence that

---

[1] A copy of the relevant portions of Plaintiff's deposition transcript is attached as Exhibit 1.

any medical professional actually diagnosed Plaintiff with clinical depression prior to this lawsuit, however, nor did Plaintiff seek assistance from any mental health professional until after the lawsuit was filed. Plaintiff has not offered any treating professionals or other medical experts as witnesses in this case to testify regarding her mental condition or its cause.

Even if Plaintiff's unsupported lay testimony regarding her feelings of depression were sufficient to demonstrate severe emotional distress, Plaintiff cannot demonstrate that any such distress was caused by Defendants. Plaintiff herself has most closely attributed her feelings of depression to her medical condition. At her deposition, Plaintiff directly linked the medication she received from her oncologist with her cancer diagnosis, explaining that when she was told she had cancer, "Mentally, it's like just to tell you that you have cancer is like a mental – it start to – you get so depressed because you don't know what's going to happen, if you die, if you're not, so it's like everything." (Polanco Dep. 88:13-24.)

Plaintiff first sought treatment from a mental health provider, Monarch NC, on May 30, 2018. In her diagnostic interview with Monarch, she identified her cancer and separation from her husband as stress factors, in addition to financial stress and fear of losing her home. As in her deposition, however, Plaintiff specifically attributed the onset of depression to her cancer diagnosis. The nurse practitioner states in his notes that "Patient report *depression start when she was Dx [with] cancer* & it has been difficult time dealing [with] going thru trxment." *See* Exhibit 2, Excerpt from May 31, 2018 Diagnostic Interview (emphasis added).[2]

As noted above, Plaintiff's statements at her deposition and to her medical health providers identify multiple potential causes of her depression. Indeed, Plaintiff herself has connected her distress to her medical condition, telling Monarch in May 2018 that her depression *started* with

---

[2] With the consent of Plaintiff's counsel, a redacted, unsealed copy of the record from the May 31, 2018 interview is attached as Exhibit 2.

7

her cancer diagnosis. In the face of these admissions, Plaintiff must present evidence supporting the allegation that her alleged injuries were caused by the actions of Defendants. But in response to an interrogatory asking Plaintiff to identify facts supporting causation, Plaintiff simply referenced the allegations in her pleadings regarding errors in the servicing of her loan account, without identifying any circumstances showing a causal link between those errors and emotional distress. *See* Exhibit 3, Responses to HSBC's and PHH's First Set of Interrogatories, Interrogatory No. 9. Plaintiff has not identified any of her medical or mental health providers as witnesses in this case, presumably due to the lack of support for causation in the records of those providers. Nor has Plaintiff identified any expert witnesses to testify on the issue of causation. Due to the lack of evidence, a jury would have no basis to draw a causal connection between Defendants' alleged conduct and Plaintiff's alleged emotional injury.

Instead of making a serious attempt to distinguish the Defendants' actions from Plaintiff's medical condition and other potential causes of her distress, Plaintiff's pleadings and discovery responses suggest that Plaintiff intends to emphasize her cancer diagnosis to appeal to the sympathies of the jury, rather than supply specific evidence of causation. The Amended Complaint repeatedly invokes Plaintiff's throat cancer as an aggravating factor in her emotional distress. Plaintiff's interrogatory responses similarly attempt to muddle the causation issue, declaring that "The acts and omissions of [Defendants] have caused Plaintiff extreme distress. [Defendants] ha[ve] continually harassed Plaintiff while she has been undergoing treatment for cancer and Plaintiff has suffered anxiety and severe depressions as a result of [Defendants'] conduct." *See* Exhibit 3, Plaintiff's Responses to HSBC's and PHH's First Set of Interrogatories, Interrogatory No. 6. These statements strongly forecast a strategy of highlighting Plaintiff's medical condition

8

in the hope that the jury will confuse the issue of causation and hold Defendants responsible for all of Plaintiff's problems.

To find that Plaintiff's injuries were proximately caused by the Defendants' actions, the jury would first have to identify those actions as a cause-in-fact of her emotional distress – that is, a cause without which the injury "could not have taken place." *See Barefoot v. Joyner*, 270 N.C. 388, 394, 154 S.E.2d 543, 548 (1967); *see also Hawkins v. Emergency Med. Physicians of Craven Cty., PLLC*, 240 N.C. App. 337, 346, 770 S.E.2d 159, 165 (2015). Plaintiff has presented no evidence, however, that would permit the jury to do more than speculate as to whether the alleged actions of the Defendants were the cause of her alleged injuries. Particularly in light of Plaintiff's admission to her mental health provider that her feeling of depression started when she was diagnosed with cancer, no reasonably jury could conclude that the actions of the Defendants were a cause "without which [the depression] could not have taken place." Because Plaintiff lacks evidence creating a genuine issue of material fact as to whether she has suffered an injury caused by the Defendants, Defendants should be granted partial summary judgment as to Plaintiff's claims for damages from emotional distress.

## II.    Defendants are entitled to summary judgment as to each of Plaintiff's individual tort causes of action

In addition to summary judgment on the issue of emotional distress damages, for the reasons set forth below, Defendants are additionally entitled to summary judgment on each of Plaintiff's individual tort claims due to Plaintiff's failure to present evidence as to one or more of the elements of her claims.

9

### A.  Fraud and Negligent Misrepresentation

Plaintiff's claims for fraud and negligent misrepresentation fail because she has presented no evidence to show either that the Defendants misrepresented material facts in connection with the 2015 modification, or that she relied on any such representations.

The tort of negligent misrepresentation occurs when (1) a party justifiably relies, (2) to his detriment, (3) on information prepared without reasonable care, (4) by one who owed the relying party a duty of care. *Brinkman v. Barrett Kays & Assocs., P.A.*, 155 N.C. App. 738, 742, 575 S.E.2d 40, 44 (2003). Fraud requires proof of a "[f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Forbis v. Neal*, 361 N.C. 519, 526–27, 649 S.E.2d 382, 387 (2007).

Promises of future conduct cannot form the basis of a misrepresentation or fraud claim. *See Gen. Elec. Capital Bus. Asset Funding Corp. v. Golden Corral Corp.*, 24 F. App'x 189, 194 (4th Cir. 2001) (affirming summary judgment on misrepresentation claim where the relevant statement "was not a representation of fact but at most a promise to act in the future."); *Reaves v. JP Morgan Chase Bank, N.A.*, No. 1:13CV192, 2014 WL 6810771, at *4 (M.D.N.C. Dec. 2, 2014), *report and recommendation adopted*, No. 1:13CV192, 2015 WL 687083 (M.D.N.C. Feb. 18, 2015) ("The mere failure to carry out a promise in a contract, such as Defendant Chase failing to carry out its alleged promise in the Agreement not to seek attorneys' fees, does not support a tort action such as for fraud or negligent misrepresentation.").

The gravamen of Plaintiff's claims is that Defendants agreed to a modification of the loan, but then failed to properly implement the modification and apply her payments correctly to the modified loan. Likewise, Plaintiff asserts that PHH promised several corrective actions in March

10

2017, but that it failed to fully implement those promises. These allegations plainly relate to promise of future conduct, and therefore cannot support a claim for fraud or negligent misrepresentation.

In denying Defendants' previous motion to dismiss the fraud and negligent misrepresentation claims, the Court noted that Plaintiff's Amended Complaint alleges that the escrow arrearages were "disguised" as a "modification transaction cost." In fact, there is no evidence to support the allegation that Defendants "disguised" the treatment of escrow arrearages in connection with the modification. The $17,709.75 in escrow arrearages, which accrued during the period in which Plaintiff and her husband failed to make payments on the loan, were simply not addressed in the modification, and Defendants never represented that those arrearages would be forgiven. PHH did send correspondence to Plaintiff identifying the "Escrow Advance and/or Setup" as one of several "modification transaction costs due," but it is not clear why this would have deceived Plaintiff into believing that the escrow advances would be wiped clean.

In any event, Plaintiff could not have relied on any representations regarding escrow arrearages because, according to her deposition testimony, she had no impression of how escrow advances would be dealt with in the modification, or even that there *were* escrow arrearages on the loan. In response to questions regarding her understanding of how the negative escrow balance would be addressed in the modification, Ms. Polanco testified that she didn't remember if she had an escrow balance on the account prior to the modification and she "wasn't aware" that the servicer had been making payments from escrow while she was in default. (Polanco Dep. 26:19-25, 27:1-25.) Since Plaintiff lacked any particular understanding of how escrow arrearages would be treated under the modification, she plainly could not have relied on any representations by the Defendants regarding escrow. Plaintiff has not produced evidence to show either that Defendants

misrepresented a material fact in connection with her modification or that she was thereby deceived, and thus fails to create a genuine issue of material fact as to the elements of her fraud and negligent misrepresentation claims. Defendants should therefore be granted summary judgment as to those causes of action.

### B.    Negligent Servicing

Plaintiffs premise their claim for "Negligent Servicing and Accounting" on alleged violations of the North Carolina Secure and Fair Enforcement Mortgage Licensing Act ("NC SAFE Act"). Although Plaintiff admits that the NC SAFE Act does not authorize a private right of action for violations of the statute, she argues that the Act creates a common law duty of care, the breach of which gives rise to a claim for ordinary negligence. As the Court noted in its denial of Defendants' motion to dismiss, the North Carolina appellate courts have thus far declined to rule on this question. *See Cordaro v. Harrington Bank, FSB*, 817 S.E.2d 247, 254 (N.C. Ct. App. 2018) ("Even assuming—without deciding—that the SAFE Act can serve as the source of a legal duty owed by a lender to a borrower in the residential loan context . . . ."). In the absence of controlling authority on this issue, a number of factors strongly weigh against this Court finding a new common law duty of care for mortgage servicing, however, including persuasive authority from other courts addressing the effect of statutes and regulations on common law negligence, evidence of legislative intent for government actors to enforce the NC SAFE Act rather than private citizens, and North Carolina precedent regarding limitations on the application of negligence *per se*.

As Plaintiff acknowledges, the NC SAFE Act does not create a private right of action. *Hetzel v. JPMorgan Chase Bank, N.A.*, No. 4:13-CV-236-BO, 2014 WL 7336863, at *7 (E.D.N.C. Dec. 22, 2014). As the North Carolina Court of Appeals stated in *Lea v. Grier*, "[O]ur case law

12

generally holds that a statute allows for a private cause of action only where the legislature has expressly provided a private cause of action within the statute."  156 N.C. App. 503, 508, 577 S.E.2d 411, 415 (2003).  In, North Carolina, the relationship between borrowers and lenders has traditionally been defined by contract rather than tort.  *See Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 368, 760 S.E.2d 263, 267 (2014) ("[T]he law does not typically impose upon lenders a duty to put borrowers' interests ahead of their own.  Rather, borrowers and lenders are generally bound only by the terms of their contract and the Uniform Commercial Code.").

The admonition in *Lea* against creating private causes of action in the absence of express legislative intent would be effectively moot if every statute or regulation gave rise to a claim for common law negligence.  In the context of federal regulation, courts have resolved this problem by holding that where a statute does not create a private right of action, it likewise does not create a new common law duty of care to the general public.  In *MacKenzie v. Flagstar Bank, FSB*, the First Circuit Court of Appeals upheld dismissal of a negligence claim premised on violations of HAMP, distinguishing between the citation of a regulatory violation as evidence of breach of a *preexisting* duty and the assertion that a statute or regulation created a *new* common law duty:

> Statutory or regulatory violations cannot give rise to a negligence claim when there is no independent duty of care between the parties. . . . Where an independent duty of care exists, the violation of a statute or regulation can provide evidence of a breach of that duty, even if the statute or regulation itself does not create a private right of action. But in the absence of an independent duty, a plaintiff cannot proceed with a negligence claim based solely on a statutory or regulatory violation.

738 F.3d 486, 495–96 (1st Cir. 2013).

Thus, courts have repeatedly refused to find the creation of a new common law cause of action where the legislative branch has declined to create a statutory one.  In *In re Agape Litigation*, the court rejected the argument that violation of the Bank Secrecy Act gave rise to a common law negligence claim, stating that "because the Bank Secrecy Act does not create a private right of

13

action, the Court can perceive no sound reason to recognize a duty of care that is predicated upon the statute's monitoring requirements." 681 F. Supp. 2d 352, 360 (E.D.N.Y. 2010); *accord Armstrong v. Am. Pallet Leasing Inc.*, 678 F. Supp. 2d 827, 875 (N.D. Iowa 2009) ("Because the Bank Secrecy Act does not permit a private right of action, it follows that it cannot be construed as giving rise to a duty of care flowing to plaintiffs in this case."); *Taylor & Co. v. Bank of Am. Corp.*, No. 3:14-CV-92-MOC-DSC, 2014 WL 3557672, at *3 (W.D.N.C. June 5, 2014), *report and recommendation adopted*, No. 3:14-CV-00092-MOC, 2014 WL 3557679 (W.D.N.C. July 18, 2014) ("Since no private right of action exists under these statutes, courts are unwilling to create a common law duty of care."). In short, the "bank's duty" under these regulations is "owed *only* to the government and not to private parties." *Douglas v. Trustmark Nat'l Bank*, 201 F. Supp. 3d 800, 807 (S.D. Miss. 2016). In *Gallipeau v. Correct Care Sols*, the U.S. District Court for the District of South Carolina rejected as "circular" a plaintiff's argument that HIPAA created a duty of care, even if it did not create a private right of action. No. CA 3:10-2017-JFA-JRM, 2011 WL 4502043, at *2 (D.S.C. Sept. 29, 2011). These rationales apply with equal force to the NC SAFE Act. In *Hetzel*, the U.S. District Court for the Eastern District of North Carolina refused to find a cause of action for negligence *per se* where the NC SAFE Act did not create a private cause of action. 2014 WL 7336863 at *7.

The legislative history for the NC SAFE Act reflects that the legislature enacted the legislation because it was "necessary to bring North Carolina's mortgage lending laws into compliance with the Housing and Economic Recovery Act of 2008." *See* Mortgage Lending Act – Federal Law – Requirements, 2009 North Carolina Laws S.L. 2009-374 (H.B. 1523). There is nothing in the Act that suggests the legislature intended for its requirements to be enforced by private tort actions. On the contrary, the Act's statement of purpose says that it "establishes within

14

this Article an effective system of supervision and enforcement of the mortgage lending industry *by giving the Commissioner of Banks broad administrative authority to administer, interpret, and enforce this Article and adopt rules implementing this Article* in order to carry out the intentions of the General Assembly." N.C. Gen. Stat. Ann. § 53-244.020 (emphasis added). To effectuate this purpose, the legislature granted the Commissioner broad powers to enforce the Act's requirements, including authority to suspend, revoke, or refuse to renew licenses; investigatory and examination authority; and disciplinary authority, including power to impose penalties for noncompliance. *See* N.C. Gen. Stat. Ann. §§ 53-244.113, 53-244.114, 53-244.115, and 53-244.116. The "duties" enumerated in the Act are thus owed to, and enforced by, the government rather than private citizens. *Cf. Douglas*, 201 F. Supp. 3d at 807.

North Carolina precedent on application of negligence *per se* also weighs against the use of the SAFE Act to create a new standard of care. North Carolina courts have applied negligence *per se* principles only to regulations imposing specific requirements for public safety. In *Lassiter v. Cecil*, the court of Appeals held that "A violation of the North Carolina Building Code constitutes negligence *per se* because the Code is a statute to promote the safety of others." 145 N.C. App. 679, 684, 551 S.E.2d 220, 223 (2001); *see also Smith v. Winn-Dixie Charlotte, Inc.*, 142 N.C. App. 255, 265, 542 S.E.2d 288, 295 (2001) (addressing statute prohibiting driving while impaired); *Al-Hourani v. Ashley*, 126 N.C. App. 519, 523, 485 S.E.2d 887, 890 (1997) (addressing regulations requiring gasoline to be sold in approved, labeled containers, whose provisions "were enacted to prevent various injuries possible from the improper storage of a highly flammable and dangerous material"). In contrast, in *Gregory v. Kilbride*, the court held that a statute specifying requirements for involuntary commitment was not a "public safety statute" and did not give rise

15

to negligence *per se*, notwithstanding some "generalized safety implications." 150 N.C. App. 601, 611, 565 S.E.2d 685, 692 (2002).

Absent an expression of legislative intent to open up a new arena of tort litigation, and in light of persuasive authority from other courts refusing to create common law claims where the legislature has declined to create a statutory one, this Court should decline Plaintiff's invitation to substantially alter the relationship between North Carolina debtors and lenders. Defendants are therefore entitled to summary judgment as to Plaintiff's claim for Negligent Servicing and Accounting and her other claims predicated on negligence.

### C.    Negligent Infliction of Emotional Distress

For the reasons stated in Section I above, Plaintiff has failed to provide evidence that she has suffered from severe emotional distress caused by the actions of Defendants. Defendants are therefore entitled to summary judgment as to Plaintiff's claim for negligent infliction of emotional distress.

### D.    Mortgage Debt Collection and Servicing Act

Defendants are entitled to summary judgment on Plaintiff's claim under the Mortgage Debt Collection and Servicing Act due to Plaintiff's failure to comply with pre-suit notice requirements set forth in the Act. N.C. Gen. Stat. Ann. § 45-94 states that at least 30 days before a borrower or a borrower's representative institutes a civil action for damages against a servicer,

> [T]he borrower or a borrower's representative shall notify the servicer in writing of any claimed errors or disputes regarding the borrower's home loan that forms the basis of the civil action. The notice must be sent to the address as designated on any of the servicer's bills, statements, invoices, or other written communication, and must enable the servicer to identify the name and loan account of the borrower. For purposes of this section, notice shall not include a complaint or summons.

Although Plaintiff's Amended Complaint alleges that she "mailed letters" to Defendants regarding errors on the account, there is no evidence Plaintiff ever sent such letters, and indeed

this allegation is contradicted by Plaintiff's own testimony. In her deposition, Plaintiff admitted that she never sent any letters to PHH or HSBC between the date of the 2015 modification and her complaint to the N.C. Department of Justice in January 2017, and that her communications with Defendants were "just phone calls." (Polanco Dep. 32:9-19.) Because Plaintiff never sent notice of claimed errors "in writing" to the servicer's address, she did not comply with the pre-suit requirements § 45-94 and her cause of action under the Mortgage Debt Collection and Servicing Act cannot proceed.

### E. RESPA

Plaintiff's surviving claims under the Real Estate Settlement Procedures Act – alleging that Defendants failed to respond to a "qualified written request" under 12 U.S.C. § 2605 – fail for similar reasons to her claims under the Mortgage Debt Collection Servicing Act. Plaintiff's allegation that she "sent Qualified Written Requests to Defendants requesting an accounting of her mortgage loan" is simply unsupported by any evidence, and is contradicted by Plaintiff's testimony that she only communicated with Defendants by telephone calls. (Polanco Dep. 32:9-19.) Defendants are therefore entitled to summary judgment as to the surviving portion of Plaintiff's RESPA claim.

### F. Unfair and Deceptive Trade Practices Act and Debt Collection Act

Plaintiff's claims under the North Carolina Unfair and Deceptive Trade Practices Act and North Carolina Debt Collection Act are overlapping, if not duplicative, in that the Debt Collection Act "constitutes the sole remedy for unfair and deceptive trade practices in the context of debt collection." Defendants acknowledge significant problems in the implementation of the Plaintiff's 2015 loan modification and that the corrections that PHH has made to the account have not resolved the dispute between the parties. However, there is no evidence of unethical,

17

unscrupulous, deceptive, harassing, or abusive conduct supporting a cause of action under the Unfair and Deceptive Trade Practices Act or the Debt Collection Act.

To prevail on a claim under the Unfair and Deceptive Trade Practices Act, the plaintiff must show an unfair or deceptive act or practice, or an unfair method of competition, in or affecting commerce, which proximately caused actual injury to the plaintiff or to his business. *Brinkman v. Barrett Kays & Assocs., P.A.*, 155 N.C. App. 738, 743, 575 S.E.2d 40, 44 (2003). A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive. *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). The North Carolina Supreme Court has observed that "egregious or aggravating circumstances must be alleged and proved before the Act's provisions may take effect." *Dalton*, 353 N.C. at 657, 548 S.E.2d at 711 (internal quotations and alterations omitted). Furthermore, "it is well recognized that actions for unfair or deceptive trade practices are distinct from actions for breach of contract, and that a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75–1.1." *Eastover Ridge, L.L.C. v. Metric Constructors, Inc.*, 139 N.C. App. 360, 367–68, 533 S.E.2d 827, 832–33 (2000) (internal quotations and alterations omitted). It is "unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations." *Id.* at 368, 533 S.E.2d at 833 (*quoting Broussard v. Meineke Discount Muffler Shops*, 155 F.3d 331, 347 (4th Cir. 1998)).

N.C. Gen. Stat. § 75-51 prohibits a "debt collector" from attempting to collect a debt "by means of any unfair threat, coercion, or attempt to coerce." N.C. Gen. Stat. § 75-52 prohibits conduct "the natural consequence of which is to oppress, harass, or abuse any person in connection with the attempt to collect a debt." N.C. Gen. Stat. § 75-54 prohibits debt collection using a

"fraudulent, deceptive or misleading representation." N.C. Gen. Stat. § 75-55 prohibits collection by "any unconscionable means."

Although Defendants acknowledge significant problems with the implementation of Plaintiff's 2015 modification, Plaintiff has not demonstrated actual abusive or harassing behavior by any representatives of PHH or HSBC, nor that PHH or HSBC sought to deceive Plaintiff. At her deposition, Plaintiff herself stated that the problems with the account were not "on purpose" but were the result of not having the "right people" to prevent mistakes. (Polanco Dep. 50: 19-25, 51: 1-25.) Given that even an intentional breach of contract does not rise to an unfair trade practice under North Carolina law, unintentional mistakes cannot constitute an unfair trade practice on the part of either PHH or HSBC.

## CONCLUSION

For the reasons stated herein, Plaintiffs have failed to demonstrate a genuine issue of material fact as to her claims for emotional distress damages, as well as for one or more elements of Plaintiff's individual claims for fraud, negligent misrepresentation, negligent servicing, negligent infliction of emotional distress, North Carolina Mortgage Debt Collection and Servicing Act, Real Estate Settlement Procedures Act, North Carolina Unfair Trade Practices Act, and North Carolina Debt Collection Act, and summary judgment should be granted for Defendants on each of these claims.

Respectfully submitted, this the 6th day of September, 2019.

/s/ G. Benjamin Milam
G. Benjamin Milam, Esq. [NC Bar No.45483]
**Bradley Arant Boult Cummings LLP**
214 North Tryon Street, Suite 3700

19

Charlotte, NC 28202
Telephone: (704) 338-6049
Facsimile: (704) 332-8858
bmilam@bradley.com

*Attorney for HSBC Bank USA, N.A., PHH Mortgage Corporation, 21st Mortgage Corporation, and Christiana Trust, a Division of Wilmington Savings Fund Society, FSB, as Trustee for Knoxville 2012 Trust*

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of September, 2019 I have mailed the foregoing to the following parties by filing a copy with the Court's electronic filing system and by depositing a copy thereof in the United States Mail in Charlotte, North Carolina, postage pre-paid and addressed as follows:

Stacy L. Williams, Esq.
Travis E. Collum, Esq.
Collum & Perry, PLLC
109 West Statesville Ave.
Mooresville, NC 28115

*Attorneys for Plaintiffs*

/s/ G. Benjamin Milam
G. Benjamin Milam