# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL ACTION NO. 3:17-CV-00466-GCM

| | |
|---|---|
| CLAUDIA E. POLANCO, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) **ORDER** |
| HSBC BANK USA NATIONAL ASSOCIATION, PHH MORTGAGE CORPORATION, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

**THIS MATTER COMES** before the Court on the Parties' cross motions for summary judgment (Doc. Nos. 58, 60) and Defendants' Motion to Strike (Doc. No. 76). The Court, having carefully considered the briefs and materials submitted in support of the respective motions and the oppositions thereto, and being otherwise fully advised, finds and orders as follows:

## I. FACTUAL BACKGROUND

The alleged facts relevant to these motions are as follows. In 2007, Plaintiff's husband, Oscar Polanco, obtained a $214,000.00 loan from Defendant HSBC Bank USA National Association ("HSBC") secured by Plaintiff's real property located in Mecklenburg County, North Carolina. (Doc. No. 1-2, at 24). In 2012, HSBC and Defendant PHH Mortgage Company ("PHH") (together "Defendants") entered into a "Subservicing Agreement" ("Agreement") whereby PHH became the servicing agent for Mr. Polanco's loan. (Doc. No. 67, at 11, 12; Doc. No. 39-15, at 3). In 2013, Mr. Polanco executed a quitclaim deed in favor of Plaintiff. (Doc. No. 1-2, at 47). In that same year, the loan went into default. (Doc. No. 60-1, at 2). After defaulting, Plaintiff entered into

1

a Loan Modification Agreement ("LMA") with Defendants which modified the loan's terms and allowed Plaintiff to keep her home. (Doc. No. 60-1, at 2; Doc. No. 59, at 1; Doc. No. 1-2, at 52).

However, the LMA did not address $17,709.95 in escrow arrearages, which had accrued as a result of PHH's payments for taxes and insurance while the account was in default. (Doc. No. 60-1, at 2). Nor did PHH immediately implement the LMA, and, when it did, Plaintiff's payments were not applied to the loan correctly. (Doc. No. 60-1, at 2). As a result of the misapplied payments, the loan was temporarily referred, once again, for foreclosure proceedings, though no foreclosure was completed, and Plaintiff did not lose possession of her home. (Doc. No. 60-1, at 2).

In response to the misapplication of her funds, Plaintiff filed a complaint with the North Carolina Attorney General's Office ("AG's Office") in January 2017. (Doc. No. 59, at 1). The AG's Office then sent a letter requesting that Defendants investigate Plaintiff's account. (Doc. No. 59, at 1). Defendants acknowledged that they misapplied Plaintiff's payments and now allege that they have corrected those errors by contributing their own funds and making other adjustments to bring Plaintiff's loan current. (Doc. No. 60-1, at 2). However, Defendants did not fully waive Plaintiff's escrow arrearages. (Doc. No. 60-1, at 1; Doc. No. 59, at 3, 4). Plaintiff alleges that Defendants' failure to fully waive the escrow arrearages has caused (and continues to cause) her harm. (Doc. No. 59, at 2, 3, 4).

## II. STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(c), "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Id.* at 323. Once the movant has met the initial burden, the burden then shifts to the non-moving party to identify specific facts showing there is a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In considering a motion for summary judgment, a Court views all evidence in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990). However, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252.

"If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed." Fed. R. Civ. P. 56(e)(2). Further, where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the proof at trial . . .[,] there can be no genuine issue as to [a] material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322, 323 (citation and quotations omitted). Where parties file cross motions for summary judgment, a "court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acci. & Indem. Co.*, 627 F. Supp. 170, 172 (D. Md. 1985) (citing Wright, Miller & Kane, *Federal Practice and Procedure*: Civil 2d § 2720.) It is with these standards in mind that the Court considers the present matter.

## III. DISCUSSION

Plaintiff moves for summary judgment: (1) that PHH acted as Defendant HSBC Bank USA National Association's ("HSBC") agent when servicing Plaintiff's loan, (2) that the North Carolina Secure and Fair Enforcement Mortgage Licensing Act ("SAFE Act") imposes a legal duty upon Defendants beyond the contractual relationship of the parties, (3) that violation of the SAFE Act is a violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), (4) in favor of Plaintiff's UDTPA claim, (5) in favor of Plaintiff's breach of contract claim, and (6) against Defendants' failure to state a claim, laches, statute of limitations, economic loss rule, bona fide error, and learned profession exception defenses. Defendants move for summary judgment against Plaintiff's: (1) negligent infliction of emotional distress ("NIED") claim, (2) fraud claim, (3) negligent misrepresentation claim, (3) negligent accounting and servicing ("NAS") claim, (4) Mortgage Debt Collection and Servicing Act ("MDCSA") claim, (5) Real Estate Settlement Procedures Act ("RESPA") claim, and (6) UDTPA claim. In addition, Defendants argue, in their Motion to Strike, that "Mr. Polanco's testimony at his deposition . . . should not be considered . . . to determine . . . Plaintiff's alleged damages for emotional distress." (Doc. No. 76). The Court now addresses each issue in turn.

### A. Agency

Plaintiff requests summary judgment as to HSBC's vicarious liability for PHH's actions while servicing Plaintiff's loan. (Doc. No. 59, at 6; Doc. No. 67, at 11). "There are two essential ingredients in the principal-agent relationship: (1) Authority, either express or implied, of the agent to act for the principal, and (2) the principal's control over the agent." *Vaughn v. N.C. Dep't of Human Res.*, 37 N.C. App. 86, 91, 245 S.E.2d 892, 895 (1978) (citing *Sharpe v. Bradley Lumber Company*, 446 F. 2d 152 (4th Cir. 1971), *cert. denied* 405 U.S. 919, 92 S.Ct. 946 (1972); *Julian v.

*Lawton*, 240 N.C. 436, 82 S.E. 2d 210 (1954)). "Whenever the principal retains the right 'to control and direct the manner in which the details of the work are to be executed' by his agent, the doctrine of *respondeat superior* operates to make the principal vicariously liable for the tortious acts committed by the agent within the scope of his employment." *Vaughn*, 296 N.C. at 686 (citations omitted and emphasis added).

Here, HSBC (1) expressly authorized PHH to act on its behalf and (2) clearly controlled and directed the manner in which PHH worked. PHH's authority to act on behalf of HSBC is illustrated by HSBC's execution of Limited Powers of Attorney appointing PHH as its true and lawful attorney-in-fact. (Doc. No. 59-2, at 1, 2). Further, PHH acted on HSBC's behalf with regard to Plaintiff's loan when it sent a letter to the North Carolina Attorney General, signing it as the "servicing agent for HSBC." (Doc. No. 39-15, at 2, 3). Similarly, a Corrective Appointment of Substitute Trustee regarding Plaintiff's property was filed on October 24, 2014 and signed by an "Assistant Vice President" of PHH as an "Authorized Agent of HSBC." (Doc. No. 59-3, at 1, 2). Defendants' Rule 30(b)(6) witness (testifying on behalf of both PHH and HSBC) agreed that PHH had signed that document "as an authorized agent of HSBC." (Doc. No. 59-1, At 7). Defendants made no attempt to rebut any of these facts, and the Court considers them undisputed. *See* Fed. R. Civ. P. 56(e)(2). Thus, HSBC clearly authorized PHH to act on its behalf when servicing Plaintiff's loan.

While Defendants do not appear to contest the fact that HSBC authorized PHH to act on its behalf, Defendants argue that Plaintiff has not established that HSBC controlled the manner in which PHH executed its duties with regard to Plaintiff's loan. (Doc. No. 65, at 12, 13). In response, Plaintiff argues HSBC exercised control over PHH through a Subservicing Agreement ("Agreement") that both parties entered on May 3, 2012. (Doc. No. 67, at 11, 12). In that

Agreement, "PHH agree[d] to provide, and HSBC agree[d] to utilize, the Subservicing Services in connection with the subservicing of Mortgage Loans, subject to and *in accordance with the terms of the Agreement*." (Doc. No. 67-3. At 3). The Agreement also "contemplate[d] that . . . manuals" would be used that contain "HSBC-specific requirements [and] policies and procedures that PHH must follow and with which PHH must comply." (Doc. No. 67-3, at 4). Further, the Agreement gave HSBC the "right in its sole discretion to approve . . . or withhold its approval of, any action or inaction of PHH in providing the Subservicing Services that would have a material adverse effect on the Subservicing Services or on HSBC or the Customers, cause a security risk, result in noncompliance with Law or result in additional costs to HSBC." (Doc. No. 67-3, at 5). The Agreement even specified what third-party law firms PHH could use. (Doc. No. 67-3, at 6, 7). Thus, the Agreement clearly provides for HSBC's control over the manner in which PHH executed its duties regarding Plaintiff's loan. Because Plaintiff has demonstrated the absence of a genuine issue of material fact with regard to both elements of *respondeat superior* and Defendants, both in their briefing and at oral argument, have failed to identify facts to the contrary, Plaintiff's motion for summary judgement as to HSBC's vicarious liability for PHH's actions while servicing Plaintiff's loan and within the scope of its employment is **GRANTED**.

### B. Breach of Contract

Plaintiff requests summary judgment on her breach of contract claim. (Doc. No. 59, at 15-18). In North Carolina, the "elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Crosby v. City of Gastonia*, 635 F.3d 634, 645 (4th Cir. 2011) (quotations omitted). While Plaintiff and Defendants agree that the LMA was a contract (Doc. No. 59, at 16; Doc. No. 65, at 10-11), the parties diverge regarding the second element of Plaintiff's breach claim. According to Plaintiff, Defendants violated their contractual

6

duty to properly apply her loan. (Doc. No. 59, at 17). Defendants acknowledge that they did not properly apply Plaintiff's loan payments (Doc. No. 65, at 4, 6), but they assert that by applying $17,709.85 of PHH's own funds to Plaintiff's account, they took corrective action within a reasonable period after receiving notice of the breach, consistent with the LMA (Doc. No. 65, at 10, 10, n. 1). In response, Plaintiff concedes that Defendants took corrective action but argues that, because it took fifteen months, the corrective action did not occur within a "reasonable period" as required by the LMA. (Doc. No. 67, at 11). However, Plaintiff failed to support that assertion with any citations to the record (Doc. No. 67, at 11), and, consequently, the Court considers Defendants' assertion that it took corrective action, thereby correcting any breach, unrebutted, *see* Fed. R. Civ. P. 56(e)(2). Because Defendants identified specific facts showing that there is a genuine issue of material fact, Plaintiff's motion for summary judgment regarding its breach of contract claim is **DENIED**.

C. **Fraud**

Defendants move for summary judgment on Plaintiff's fraud claim. (Doc. No. 60-1, at 10). In North Carolina, the elements of fraud are:

> (1) [a f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party. An essential element of actionable fraud is that the false representation or concealment be made to the party acting thereon.

*Sain v. Adams Auto Grp., Inc*., 244 N.C. App. 657, 662 (2016) (citations omitted). Defendants argue that Plaintiff has produced no evidence supporting the fourth element of her fraud claim—that she was deceived regarding the handling of the escrow arrearages. (Doc. No. 60-1, at 10). Defendants also cite evidence showing that she was not deceived, relying on the following exchange from Plaintiff's deposition:

> Q. Okay. And do you know—prior to the modification, do you know if the lender continued paying for taxes and insurance after you stopped making payments?

7

> A. I don't.
> Q. Okay. And the reason I'm asking the questions is to try and figure out if you had any particular understanding or intent as to how past escrow payments by the lender would be incorporated in the modification terms. And what I understand you to tell me right now is that at the time you entered the modification, you were not aware whether the lender was making escrow payments or was making payments out of the escrow account?
> A. No, *I wasn't aware*.

(Doc. No. 60-3, at 5) (emphasis added). According to Defendants, Plaintiff could not have been deceived as to how the escrow arrearages would be treated under the LMA if she did not even know that there "*were* escrow arrearages." (Doc. No. 60-1, at 11).

Plaintiff responds that she "viewed the LMA as a way to wipe the slate clean of all missed payments, late fees, and any *escrow arrearages* and start fresh with the Defendants." (Doc. No. 66, at 9) (emphasis added). In other words, Plaintiff argues that Defendants led her to believe that the LMA would include all outstanding issues because Defendants mentioned no exceptions. However, because Plaintiff did not support that argument with citation to her testimony or to any other evidence indicating her understanding of the agreement (Doc. No. 66, at 9), the Court treats Defendants' factual assertions as undisputed, *see* Fed. R. Civ. P. 56(e)(2). Thus, there is no genuine dispute that Plaintiff could not have been deceived about how the escrow arrearages would be treated under the LMA because she did not know that there were any escrow arrearages, and Defendant's motion for summary judgment against that claim is **GRANTED**.

### D. Negligent Misrepresentation

Defendants also move for summary judgment against Plaintiff's negligent misrepresentation claim. (Doc. No. 60-1, at 13). The elements of a negligent misrepresentation claim are that a plaintiff (1) justifiably relied, (2) to his or her detriment, (3) on information prepared without reasonable care, (4) by one who owed the relying party a duty of care. *Walker v. Town of Stoneville*, 211 N.C. App. 24, 30 (2011). Similar to Defendants' argument above regarding

Plaintiff's fraud claim, Defendants argue that Plaintiff could not have relied on information from Defendants about the escrow arrearages and the manner in which they would be treated under the LMA because she did not even know that there "*were* escrow arrearages." (Doc. No. 60-1, at 11). In making that argument, Defendants cite to statements made by Plaintiff at her deposition. (Doc. No. 60-3, at 5). Portions of those statements are provided above. *See supra* at 7. Plaintiff's rebuttal—that by not mentioning any exceptions, Defendant HSBC was leading her to believe that the LMA would include all outstanding issues—fails for the same reason it failed above: It is not supported by citation to her testimony or to any other evidence indicating her understanding of the agreement. (Doc. No. 66, at 9). Thus, the Court treats Defendants' factual assertion—that Plaintiff did not rely on information from Defendant about the escrow arrearages—as undisputed. *See* Fed. R. Civ. P. 56(e)(2). Because Plaintiff has failed to establish the first element of her negligent misrepresentation claim, Defendants' motion for summary judgment against that claim is **GRANTED**.

### E. Negligent Infliction of Emotional Distress

Defendants move for summary judgment against Plaintiff's NIED claim. (Doc. No. 60-1, at 4, 7-10). In North Carolina, the elements of a NIED claim are that "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress (often referred to as 'mental anguish'), and (3) the conduct did in fact cause the plaintiff severe emotional distress." *Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.*, 327 N.C. 283, 304 (1990) (citations omitted). Defendants argue that Plaintiff presents only uncorroborated lay testimony insufficient to establish that "Defendants' actions were the cause of her alleged [emotional distress]" and that, consequently, "Defendants are entitled to summary judgment as to" Plaintiff's NIED claim. (Doc. No. 60-1, at 4, 5).

Plaintiff responds that the evidence she has presented, including testimony from friends and family, is sufficient to show that Defendants caused Plaintiff's emotional distress. (Doc. No. 66, at 3, 4). For example, Plaintiff sent a letter to the AG's Office on January 1, 2017 stating that she has "been getting physically sick trying to resolve the matter of payments" to Defendants and that the experience has caused her "disappointment, emotional[] distress, and . . . severe health issues," including impediments to her eating and appetite. (Doc. No. 66-8, at 18, 19, 25). However, in that letter, Plaintiff also stated that the stress of the "foreclosure also tie[d] in with [her] pre existing condition of throat cancer" and that as she was going through "treatments for throat cancer that [were] very painful" before Defendants "added" the "stress . . . of foreclosure." (Doc. No. 66-8, at 25). Plaintiff reinforced her suggestion that cancer was the root cause of her distress when she stated, later, that the foreclosure made the distress she felt from fighting cancer "worse." (Doc. No. 66-1, at 3). While Plaintiff presents multiple possible causes of her current distress, she provides no basis for a jury to parse the alleged harm caused by Defendants from the harm caused by her throat cancer.

The other evidence cited by Plaintiff suffers from a similar flaw. For example, Plaintiff's friend Robyn Moore testified that HSBC "cost [Plaintiff's] marriage," "caused her embarrassment," caused her "suffering and pain," and caused her to have suicidal ideations and to "try to commit suicide." (Doc. No. 66-2, at 2). However, Plaintiff testified that she separated from her husband *before* the LMA was executed. (Doc. No. 68-3, at 3, 5). Thus, the misconduct of which Plaintiff complains in this case (involving the mishandling of the LMA agreement) could not have caused that separation. In addition, Ms. Moore testified—consistent with Plaintiff's testimony— that the stress caused by Defendants was merely "on top of" the stress Plaintiff already suffered as a result of cancer. (Doc. No. 66-2, at 2). In other words, Ms. Moore testified that Plaintiff was

already suffering as a result of her cancer before Defendants are alleged to have caused Plaintiff emotional distress. Lastly, Ms. Moore's testimony (taken July 30, 2018) that Plaintiff had current suicidal ideations and that she had tried to commit suicide is contradicted by Plaintiff's May 31, 2018 interview with a mental health provider when Plaintiff reported that she did not have any current suicidal ideations and that she did not have a history of suicide attempts. (Doc. No. 66-2, at 4; Doc. No. 60-4, at 2). While Ms. Moore also asserted that Plaintiff had suicidal ideations in 2015 and Plaintiff stated that she had a prior history of suicidal ideations, neither statement shows that Plaintiff's suicidal ideations began after the LMA was executed on November 5, 2015. (Doc. No. 59, at 1).

Plaintiff also relied on testimony from her husband, Oscar Polanco, and her daughter, Claudia Angel, asserting that Plaintiff and Mr. Polanco separated as a result of Defendants' actions and that Plaintiff has become more emotional since Defendants' alleged mishandling of the LMA. (Doc. No. 66, at 6). However, as discussed above, Plaintiff separated from her husband before the LMA was executed. *See supra* at 10. Further, Plaintiff stated that her cancer diagnosis "was difficult, both emotionally and physically" and that it occurred "[a]round the same time . . . that she began receiving notices from the Defendants that her home was headed to foreclosure." (Doc. No. 66, at 7). Those statements, once again, present multiple possible causes—throat cancer and Defendants' actions—of Plaintiff's increased emotionality.

Defendants cite additional evidence that, when coupled with the evidence cited by Plaintiff, makes clear that a reasonable jury could not conclude that Defendants were the proximate cause of Plaintiff's emotional distress. Specifically, in 2018 Plaintiff's mental health provider noted that she had a history of depression, starting "when she was [diagnosed with] cancer." (Doc. No. 60-4, at 2). In addition, Defendants prompted Plaintiff—via interrogatories—to provide statements

11

supporting her contention that her damages were caused by Defendants, and she declined to do so. (Doc. No. 60-5, at 5). Put simply: the evidence clearly establishes that Plaintiff's cancer is at least the initial cause of her emotional distress, and Plaintiff fails to provide any basis for a jury to determine that Defendants' actions, not Plaintiff's cancer, caused the emotional distress complained of in this case. Consequently, summary judgment against Plaintiff's NIED claim is **GRANTED**. *See Harrison v. Edison Bros. Apparel Stores*, 814 F. Supp. 457, 462 (M.D.N.C. 1993) (Dismissing a plaintiff's negligent retention claim, brought under North Carolina law, where there was "no doubt" that the plaintiff had suffered emotional distress but where "other stressors [were] possible alternative causes of [the plaintiff's] emotional injuries" and there was no evidence presented as to which possible cause was the correct one.). In addition, Defendants' Motion to Strike, which argues that "Mr. Polanco's testimony at his deposition . . . should not be considered . . . to determine . . . Plaintiff's alleged damages for emotional distress," is **DENIED** as **MOOT** because summary judgment has been granted against Plaintiff's NIED claim.

### F. Negligent Accounting and Servicing

Plaintiff seeks partial summary judgment as to the legal duty elements of her NAS, NIED, and negligent misrepresentation claims. (Doc. No. 59. At 9). Because the Court has granted summary judgment against Plaintiff's NIED and negligent misrepresentation claims, the Court need only consider Plaintiff's argument with respect to her NAS claim. Plaintiff argues that because the Court, in its order on Defendants' Motion to Dismiss, has previously determined that "the SAFE Act provides a sufficient legal duty upon which Plaintiff can maintain her tort causes of action," there is no genuine issue of material fact as to whether Defendants owed Plaintiff a duty. (Doc. No. 59, at 9) (citation omitted). Of course, a determination that Plaintiff's tort claims should not be dismissed because the SAFE Act *may* create a duty for Plaintiff to maintain tort

12

claims simply is *not* a determination that there is no genuine dispute that Defendants owe Plaintiff a duty, and the Court finds that argument misguided.

Plaintiff, however, provides other arguments in favor of summary judgment. For example, Plaintiff cites testimony from Defendants' corporate representative agreeing that Defendants "have a duty to act with reasonable skill, care, and diligence in servicing [Plaintiff's] loan." (Doc. No. 59, at 8) (citing Doc. No. 59-1, at 25). Defendants respond by arguing exclusively that the SAFE Act *cannot* create a duty of care for Plaintiff's tort claims. (Doc. No. 65, at 13-15). However, that question has already been resolved by the Court, which determined, as explained above, that the SAFE Act *can* create such a duty. (Doc. No. 51, at 7). Further, because Defendants do not address Plaintiff's assertion that Defendants' corporate representative conceded that they owed Plaintiff a duty when servicing her loan, the Court considers that fact undisputed. *See* Fed. R. Civ. P. 56(e)(2). Thus, there is no genuine dispute whether Defendants owed Plaintiff a duty regarding Plaintiff's NAS claim and Plaintiff's motion for summary judgment as to that element is **GRANTED**.

### G. Unfair and Deceptive Trade Practices

Both Plaintiff and Defendants move for summary judgment of Plaintiff's UDTPA claim. (Doc. No. 59, at 14; Doc. No. 60-1, at 17). To prevail on a UDTPA claim, a plaintiff must show an (1) unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business. *Brinkman v. Barrett Kays & Assocs., P.A.*, 155 N.C. App. 738, 743, 575 S.E.2d 40, 44 (2003). However, the UDTPA does not govern the "area of commerce regulated by [the North Carolina Debt Collection Act ("DCA")]." *Musenge v. SmartWay of the Carolinas, LLC*, No. 3:15-cv-153-RJC-DCK, 2018 U.S. Dist. LEXIS 158044, at *12 (W.D.N.C. Sep. 17, 2018) (citing N.C. Gen. Stat. § 75-56). Instead, "[t]he []DCA constitutes the sole remedy for unfair and deceptive trade practices in the

context of debt collection." *Id.* (citing *DIRECTV, Inc. v. Cephas*, 294 F. Supp. 2d 760, 765 (M.D.N.C. 2003) ("If the abusive conduct alleged pertains only to debt collection, the NCDCA provides a claimant's exclusive remedy.")).

Defendants allege that Plaintiff's UDTPA claim is improperly duplicative of her DCA claim because the DCA, not the UDTPA, is the proper remedy for unfair and deceptive trade practices in the context of debt collection. (Doc. No. 60-1, at 17). In Plaintiff's response, each of the facts she alleges in support of her UDTPA claim involve the collection of debt. For example, Plaintiff alleges that the Defendants concealed how the escrow arrearages would be handled by the LMA, that Defendants did not properly apply loan payments, and that Defendants did not take the "corrective action" that they had promised with regard to the loan. (Doc. No. 66, at 21-24). Thus, there is no genuine dispute that Plaintiff's allegations involve the collection of debt. Because those allegations may not support Plaintiff's UDPTA claim, Plaintiff has failed to establish the second element of her UDTPA claim and summary judgment is appropriate. *See Celotex*, 477 U.S. at 322, 323. Thus, Plaintiff's motion for summary judgment in favor of her UDTPA claim is **DENIED**, and Defendants' motion for summary judgment against Plaintiff's UDTPA is **GRANTED**.

### H. Mortgage Debt Collection and Servicing Act

Defendants move for summary judgment on Plaintiff's MDCSA claim, arguing that Plaintiff failed to comply with pre-suit notice requirements set forth in the MDCSA. The MDCSA requires mortgage servicers to "[p]romptly correct errors relating to the allocation of payments, the statement of account, or the payoff balance identified in any notice from the borrower . . . or discovered through the due diligence of the servicer or other means." N.C. Gen. Stat. § 45-93(3). However, a borrower must wait "at least 30 days" after providing notice to the "servicer in writing

of any claimed errors or disputes regarding the borrower's home loan" before filing a "civil action for damages against a servicer for violation of this Article." N.C. Gen. Stat. §45-94.

Defendants argue that Plaintiff never provided notice pursuant to N.C. Gen. Stat. §45-94. (Doc. No. 60-1, at 17). In support, Defendants assert that Plaintiff "admitted that she never sent any letters to [Defendants] between the date of the 2015 modification and her complaint to the N.C. Department of Justice in January 2017, and her communications with Defendants were 'just phone calls,'" not written notice. (Doc. No. 60-1, at 17). Plaintiff responds that she wrote an extensive letter that she sent to the AG's Office and that the AG's Office then sent to HSBC on January 18, 2017. (Doc. No. 66, at 19) (citing Doc. No. 66-8, at 15). Defendants assert that the AG's Office's letter to Defendants did not satisfy N.C. Gen. Stat. §45-94 because Plaintiff's initial letter to the AG's Office was a "complaint." (Doc. No. 68, at 9, 10). In other words, Defendants assert that Plaintiff was required to notify Defendants in writing *before* sending the letter to the AG's Office. The Court disagrees. While N.C. Gen. Stat. §45-94 explains that a complaint or summons does not satisfy the notice requirement, Plaintiff's letter to the AG's Office—while termed a complaint—was not "a civil action for damages" and is not the kind of complaint §45-94 prohibits prior to the completion of the 30-day remedial window. Further, the letter sent on behalf of Plaintiff from the AG's Office to HSBC was a notice, in writing, to the servicer of Plaintiff's loan that Plaintiff claimed errors regarding her home loan, satisfying N.C. Gen. Stat. §45-94. Thus, Defendants' motion for summary judgment on Plaintiff's MDCSA claim is **DENIED**.

I. **Real Estate Settlement Procedures Act**

Defendants allege that Plaintiff's RESPA claim fails because Plaintiff has provided no evidence that she sent "Qualified Written Requests" ("QWR") to Defendants requesting an accounting of her mortgage loan. (Doc. No. 60-1, at 17). A QWR is a:

15

> written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that—
> > **(i)** includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
> > **(ii)** includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B). Plaintiff responds that the AG's Office sent a letter to HSBC on January 18, 2017, meeting all the requirements of the QWR. (Doc. No. 66, at 19). As discussed above, the letter was submitted on Plaintiff's behalf. *See supra* at 12. Further, the letter from the AG's Office included an additional letter from Plaintiff "outlining the errors and disputes she had concerning her loan" and containing Plaintiff's name, account number, address, and phone number. (Doc. No. 66, at 19) (citing Doc. No. 66-8, at 16, 19). In fact, Plaintiff specifically stated in her letter to the AG's Office that it was a "Written Qualified Request." (Doc. No. 66-8, at 19). Thus, Plaintiff has shown that there is a genuine issue of material fact that Plaintiff sent a Written Qualified Request, and Defendants' motion for summary judgment against Plaintiff's RESPA claim is **DENIED**.

### J. Defenses

Plaintiff also moves for summary judgment against Defendants' (1) failure to state a claim, (2) laches, (3) statute of limitations, (4) bona fide error, (5) economic loss rule, and (6) learned profession exception defenses. The Court now considers each defense.

#### 1. Failure to State a Claim

The Court has determined, in its Order on Defendant's Motion to Dismiss (Doc. No. 51) that each of Plaintiff's remaining claims state a claim. Thus, summary judgment against Defendants' failure to state a claim defense is **GRANTED**.

### 2. Laches and Statute of Limitations

Plaintiff asserts that Defendants' statute of limitations and laches defenses should be dismissed. (Doc. No. 59, at 18, 19). Defendants agree, with qualifications. (Doc. No. 65, at 15). Thus, summary judgement against both defenses is **GRANTED**. To the extent that Plaintiff seeks, at trial, to make claims barred by the statute of limitations or laches defenses, Defendants may raise those defenses at trial.

### 3. Bona Fide Error

Plaintiff argues that Defendants' bona fide error defense applies only to Plaintiff's previously dismissed Fair Debt Collection Practices Act claim and should be dismissed. (Doc. No. 59, at 19). Defendants agree. (Doc. No. 65, at 16-17). Thus, summary judgment against Defendants' bona fide error defense is **GRANTED**.

### 4. Economic Loss Rule

Plaintiff makes a perfunctory argument—unsupported by citation—that because the Court has determined that the SAFE Act creates a legal duty sufficient to support her tort causes of action, "the economic loss rule does not prevent her from recovering tort damages for claims resulting from Defendants' breach of contract and the claimed torts." (Doc. No. 59, at 19). The Court declines construct Plaintiff's legal argument in her stead. *See Davis v. District of Columbia*, 503 F. Supp. 2d 104 (D.D.C. 2007) (For purposes of summary judgment, perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.). Thus, Plaintiff's motion for summary judgment against Defendants' economic loss rule is **DENIED**.

### 5. Learned Profession Exception

Plaintiff seeks summary judgment against Defendants' learned profession exception defense to Plaintiff's UDTPA claim. (Doc. No. 59, at 19). Because the Court has granted summary

judgment against Plaintiff's UDTPA claim, Defendants' learned profession exception defense is moot. Therefore, Plaintiff's motion for summary judgment against Defendants' learned profession exception defense is **GRANTED**.

## IV. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART** and Defendants' Motion for Summary Judgement is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's motion for summary judgment as to HSBC's vicarious liability for PHH's actions committed within the scope of its employment is **GRANTED**; Plaintiff's motion for summary judgment for her breach of contract claim is **DENIED**; Defendants' motion for summary judgment against Plaintiff's fraud claim is **GRANTED**; Defendants' motion for summary judgment against Plaintiff's negligent misrepresentation claim is **GRANTED**; Defendants' motion for summary judgment against Plaintiff's NIED claim is **GRANTED**; Plaintiff's motion for summary judgment in favor of her UDTPA claim is **DENIED**, and Defendants' motion for summary judgment against Plaintiff's UDTPA claim is **GRANTED;** Plaintiff's motion for summary judgment in favor of the legal duty element of her NAS claim is **GRANTED**; Defendants' motion for summary judgment against Plaintiff's MDCSA claim is **DENIED**; Defendants' motion for summary judgment against Plaintiff's RESPA claim is **DENIED**; Plaintiff's motion for summary judgment against Defendants' failure to state a claim, laches, statute of limitations, bona fide error, and learned profession exception defenses are **GRANTED**; and Plaintiff's motion for summary judgment against Plaintiff's economic loss rule defense is **DENIED**. In addition, Defendants' Motion to Strike is **DENIED** as **MOOT**. Plaintiff's breach of contract, NAS, MDCSA, RESPA, and DCA claims remain.

**SO ORDERED**.

Signed: February 5, 2020

Graham C. Mullen
United States District Judge